## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**RCI HOSPITALITY HOLDINGS, INC.,**
**BIG SKY HOSPITALITY HOLDINGS, INC.,**
**EVANS DINING SERVICES, INC., dba PT'S SHOWCLUB,**
**GALENA DINING SERVICES, INC., dba PT'S SHOWCLUB CENTERFOLD,**
**GLENARM DINING SERVICES, INC., dba DIAMOND CABARET,**
**STOUT DINING SERVICES, INC., dba RICK'S CABARET,** and
**KEVIN DUERBUSCH,**

      Plaintiffs,

v.

**CITY AND COUNTY OF DENVER, COLORADO,**
**DENVER AUDITOR'S OFFICE,**
**DENVER AUDITOR TIMOTHY O'BRIEN,**
**DENVER LABOR,**
**DENVER LABOR EXECUTIVE DIRECTOR MATTHEW FRITZ-MAUER,** in his
individual and official capacities, and
**DENVER LABOR HEARING OFFICER ELLEN KELMAN,**

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs RCI Hospitality Holdings, Inc. ("RCI"), Big Sky Hospitality Holdings, Inc. ("Big Sky"), Evans Dining Services, Inc., dba PT's Showclub ("PT's Showclub"), Galena Dining Services, Inc., dba PT's Showclub Centerfold ("PT's Showclub Centerfold"), Glenarm Dining Services, Inc., dba Diamond Cabaret ("Diamond Cabaret"), Stout Dining Services, Inc., dba Rick's Cabaret ("Rick's Cabaret") (PT's Showclub, PT's Showclub Centerfold, and Diamond Cabaret, together with Rick's Cabaret, "Plaintiff

Clubs"), and Kevin Duerbusch ("Mr. Duerbusch") (RCI, Big Sky, Plaintiff Clubs, together with Mr. Duerbusch, "Plaintiffs"), through undersigned counsel, allege and aver the following.

## **INTRODUCTION**

1.      The City and County of Denver, the Denver Auditor's Office, Denver Auditor Timothy O'Brien, Denver Labor, Denver Labor Executive Director Matthew Fritz-Mauer, and Denver Labor Hearing Officer Ellen Kelman (collectively, "Defendants"), have blatantly and repeatedly exceeded the scope of their authority under the Denver Revised Municipal Code ("DRMC"), in their unprecedented attacks on Defendants.

2.      This case represents the shocking and unconstitutional government overreach of these Defendants, led by Denver Labor Executive Director Matthew Fritz-Mauer who has been on a years-long crusade to "rescue" the women who perform at adult clubs from what Defendants wrongly characterize as a predatory relationship.

3.      The individuals who perform as entertainers at Plaintiff Clubs did not ask for Defendants' "help."  They are self-sufficient women who choose to make a living in the adult nightclub industry, and who negotiated their own legal statuses as licensees with Plaintiffs in order to have the benefits and freedoms that come from controlling their own schedules, performing at however many clubs they wish, and maintaining their independence, autonomy, and anonymity.

4.      In alarmingly paternalistic fashion, Defendants have taken it upon themselves to launch a barrage of legally unauthorized investigations into Plaintiffs

under the guise of recovering "stolen wages" for entertainers, who are not employees of Plaintiffs, but instead perform for and primarily get paid directly from customers.

5.     In so doing, Defendants have far exceeded the scope of their limited statutorily-granted investigative and enforcement powers, trampled indiscriminately on Plaintiffs' due process rights, imposed exorbitant fines, and imposed unjustified adverse and harmful inferences, constituting unlawful government takings that have no basis in local, state, or federal law.

6.     Plaintiffs bring this lawsuit not only to assert and protect their constitutional rights, but also to enjoin the ongoing and blatant abuse of government power by Defendants and halt their public dissemination of the false conclusions made outside the bounds of any legally authorized procedures.

7.     If the courts do not swiftly address this unlawful overreach, it will set a dangerous precedent, placing every individual working, employed, contracted, or conducting business in Denver at the mercy of Denver Labor's arbitrary and capricious enforcement of the law.  This unchecked power threatens the rights and livelihoods of the entire Denver workforce.

8.     Defendants' actions are not merely a misstep—they are a deliberate, unlawful attempt to obliterate the legal distinctions between independent contractors, licensees, and employees.  By forcibly reclassifying individuals into employee-employer relationships they never agreed to, Denver Labor seeks to undermine entire industries in Denver, destroying established working relationships and eroding the freedoms of

those who rely on independent contracting to sustain their businesses.  This aggressive stance threatens the very fabric of entrepreneurship in the city.

9.      Acting under color of law, Denver Labor has illegally accessed confidential business records, including private information such as names, addresses, phone numbers, hours worked, and pay details of hundreds of employees without consent from the individuals involved.  This unauthorized access to sensitive personal data has resulted in the imposition of arbitrary and unjust penalties against Plaintiffs, implicating workers who never consented to be part of this dispute.

10.     Denver Labor's actions constitute a flagrant violation of the privacy rights of these individuals, denying them basic autonomy and their right to choose whether they wish to participate in government action.

11.     Denver Labor's actions are particularly egregious when it comes to independent entertainers.  These entrepreneurial women—many of whom have established successful careers in many different fields based on their autonomy—are now being coerced into an employee classification, thereby stripping them of their ability to determine their own work schedules, control their income, and manage their professional lives inside and outside of the clubs.

## THE PARTIES

12.     Plaintiff RCI is a Texas corporation with its principal place of business in Houston, Texas.   RCI is a publicly traded company with a portfolio of adult nightclubs in approximately 13 states, including Colorado.

13.     Plaintiff Big Sky, is a Texas corporation with its principal place of business in Houston, Texas.  Big Sky is a wholly owned subsidiary of RCI.

14.     Plaintiff PT's Showclub is a Colorado corporation with its principal place of business in Denver, Colorado.

15.     Plaintiff PT's Showclub Centerfold is a Colorado corporation with its principal place of business in Denver, Colorado.

16.     Plaintiff Diamond Cabaret is a Colorado corporation with its principal place of business in Denver, Colorado.

17.     Plaintiff Rick's Cabaret is a Colorado corporation with its principal place of business in Denver, Colorado.

18.     Plaintiff Kevin Duerbusch is an individual, a United States citizen, and resident of Denver, Colorado.  At all times relevant, he has worked as the General Manager at Diamond Cabaret.

19.     Defendant City and County of Denver, Colorado (the "City" or "Denver") is a home-rule municipality and a municipal corporation of the State of Colorado under the Colorado Constitution, Article XX.

20.     Defendant Denver Auditor's Office (the "Auditor's Office") is a unit or department of the City.

21.     Defendant Denver Labor is a unit or department of the Auditor's Office, though Denver Labor is not authorized as an entity, nor does it have delegated power under the DRMC.

22.     Defendant Timothy O'Brien ("Auditor O'Brien" or the "Auditor") is the independently-elected Auditor for the City, and is a resident and domiciled in the State of Colorado.  At all times relevant, Auditor O'Brien was acting under color of law and in his capacity as Auditor.  Auditor O'Brien is being sued in his official capacity.

23.     Defendant Ellen Kelman ("Hearing Officer Kelman") is an attorney who, upon information and belief is contracted by the Auditor's Office,  to serve as a Hearing Officer for disputes involving Denver Labor, and is a resident and domiciled in the State of Colorado.  At all times relevant, Hearing Officer Kelman was acting under color of law and in her capacity as Hearing Officer for Denver Labor.  Hearing Officer Kelman is being sued in her official capacity.

24.     Defendant Matthew Fritz-Mauer ("Director Fritz-Mauer" or "Fritz-Mauer") is the Executive Director of Denver Labor, and is a resident and domiciled in the State of Colorado.  At all times relevant hereto, Director Fritz-Mauer was acting under color of law and in his capacity as Executive Director of Denver Labor.  Director Fritz-Mauer is being sued in his official and individual capacities.

## <u>JURISDICTION AND VENUE</u>

25.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

27.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the same transactions and occurrences that form the basis of Plaintiffs' federal claims also form the basis of Plaintiffs' other claims.

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 2201, as there exists an actual controversy between the Plaintiffs and Defendants regarding the scope of Defendants' legal authority to investigate, enforce, and penalize alleged violations of wage theft laws under Chapter 58 of the DRMC, including whether Denver Labor's investigatory and enforcement actions, internal rules and procedures, demands for confidential and other business records, and imposition of penalties, exceed the statutory limitations set forth in the DRMC, Denver's City Charter, and Colorado law.

29.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because all Defendants are municipalities, cities, departments, and residents of Colorado and a substantial part of the acts giving rise to this action occurred in this judicial district.

## **STATEMENT OF FACTS**

***Colorado Law Regarding Minimum Wage***

30.     The Colorado Wage Claim Act, Colo. Rev. Stat. §§ 8-4-101 to 124 ("CWCA") and the Colorado Minimum Wage Act, Colo. Rev. Stat. §§ 8-6-101 to 120 ("CMWA") is the body of law that governs minimum wage and overtime pay for Colorado employees.

31.     The Colorado Director of the Division of Labor Standards and Statistics ("DLSS") is granted authority to regulate overtime pay and wage-related matters under

the Colorado Department of Labor and Employment ("CDLE").  <u>See</u> Colo. Rev. Stat. §§ 8-4-111, 8-6-105, 8-6-108, 8-13.3-407.

32.     The Colorado General Assembly has further reinforced state-level enforcement mechanisms through SB-161, which established a worker protection unit within the Colorado Attorney General's Office to oversee compliance with wage laws.

33.     Additionally, the CWMA allows local governments to implement higher minimum wages than the state rate but does not grant them enforcement authority over wage-related violations beyond their local wage laws.

34.     Similarly, the CWCA and CMWA are implemented through state-promulgated Colorado Overtime and Minimum Pay Standards ("COMPS") Orders, govern minimum wage, overtime, and other wage protections on a statewide basis.

35.     The COMPS Orders—successive versions of which have been in effect since March 2020—supersede prior wage orders and establish the DLSS as the sole regulatory authority for wage and hour matters across Colorado.  These orders explicitly state that the DLSS has exclusive jurisdiction over wage enforcement and interpretation, precluding other agencies or local governments from asserting authority over wage-related issues beyond what state law expressly permits.  <u>See</u> Rule 8.6 of each COMPS Order titled "Divisional and Dual Jurisdiction" (stating that the DLSS "has jurisdiction over all questions arising with respect to the administration and interpretation of the COMPS Order.").

***The Auditor's Limited Authority to Investigate Employers***

36.     In Denver, the Auditor is an elected official who serves the City independently from the Mayor's Office and Denver City Council.

37.     The Auditor's authority arises from Denver's City Charter, Article V, which sets forth the general powers and duties of the Auditor.  Among other things, the Auditor's powers and duties include the power to conduct financial and performance audits of City departments and agencies, the duty to chair the City's Audit Committee, and the authority to carry out other duties specifically assigned to the Auditor by ordinance.  See Denver City Charter § 5.2.1.

38.     In 2019, the Colorado General Assembly enacted HB 19-1210, which revised state wage laws, effective January 1, 2020.  This legislation granted local governments the authority to set a minimum wage higher than the statewide rate and to enforce their own local minimum wage laws.  Enforcement mechanisms include private rights of action, fines, penalties, recovery of unpaid wages, liquidated damages, interest, attorney's fees, and any other provisions necessary to uphold the local minimum wage.  See Colo. Rev. Stat. § 8-6-101(3).

39.     Additionally, Colo. Rev. Stat. § 29-1-1401 affirms that local governments may enact laws establishing a minimum wage for work performed within their jurisdiction, provided such laws align with the requirements of Colo. Rev. Stat. § 8-6-101.

40.     In November 2019, Denver City Council designated additional duties and powers to the Auditor when it added Chapter 58 to the DRMC.

41.    The original intent of Chapter 58 was to ensure that as many Denver workers as possible were paid at least minimum wage.  Denver City Council sought to achieve this goal by, in part, creating a new, Denver-specific minimum wage.

42.    Notably, and logically, Denver City Council explicitly excluded independent contractors from Chapter 58's definition of "worker," thereby exempting them from Denver's new minimum wage requirement.

43.    Specifically, Chapter 58 defined "worker" as "a person performing work, and includes, but is not limited to: full time employees, part-time employees, temporary workers, agents, and any other person or entity performing work on behalf of or for the benefit of an employer. This definition shall not apply to work performed by independent contractors while acting solely in such capacity or by persons providing volunteer services that are uncompensated except for reimbursement of expenses such as meals, parking or transportation."  See DRMC § 58-18(e) (2019).

44.    Chapter 58 also created mechanisms to enforce and investigate alleged violations of the DRMC's new Denver-specific minimum wage provisions.  Denver City Council designated these limited enforcement and investigative powers to the Auditor.

45.    In November 2022, Denver City Council sought to expand the scope of Chapter 58 beyond minimum wage enforcement by way of a sweeping amendment ("Civil Wage Theft Bill").  The Civil Wage Theft Bill, *inter alia*, proposed the creation of a civil penalty for wage theft offenses, the imposition of a requirement that employers maintain payroll records for three years, and the delegation of even more enforcement

and investigative powers to the Auditor, outside the bounds of authority granted under Colo. Rev. Stat. §§ 8-6-101 and 29-1-1401.

46.    The Civil Wage Theft Bill also sought to expand the definition of "worker" by removing the former express exclusion of independent contractors.

47.    The new definition states that "worker means a natural person performing work, and includes, but is not limited to: full time employees, part-time employees, temporary workers, agents, and any other persons performing work on behalf of or for the benefit of an employer or other person."  See DRMC § 58-1(11).

48.    The Civil Wage Theft Bill was passed by Denver City Council on January 9, 2023, and signed by then-Mayor Michael Hancock the following day, formally amending Chapter 58 of the DRMC and empowering the Auditor to investigate alleged violations not only of Denver's minimum wage requirement, but also its civil wage theft provisions (as passed "Civil Wage Theft Ordinance").

49.    The enforcement and investigative powers promulgated by Chapter 58, as amended, are expressly granted to the Auditor, and the Auditor alone.  Specifically:

a.    DRMC § 58-3(a)(1) provides that "[a]ny person may submit a written complaint of a violation of this article to **the auditor**;"

b.    DRMC § 58-3(b) provides that "**[t]he auditor** may initiate an investigation into violations of this article absent a complaint if there is a reasonable basis to believe that a violation occurred;"

c.    DRMC § 58-4(b) provides that "**[t]he auditor** is authorized to assess civil penalties pursuant to this article;" and

       d.      DRMC § 58-2(c)(2) provides that "[p]ursuant to a wage investigation or a private right of action, ***the auditor*** may request a certified copy of payroll records for all workers for a three (3) year period from an employer."

<u>See</u> DRMC § 58-2 to § 58-4 (emphasis added).

50.     Though the amendments to Chapter 58 under the Civil Wage Theft Bill were significant, the investigative powers ultimately granted to the Auditor are limited. Indeed, the Auditor only has the authority to initiate a wage theft investigation into an employer under two narrowly-defined sets of circumstances.

51.     The first circumstance in which the Auditor may initiate a civil wage theft investigation is where the Auditor receives a written complaint specifically alleging a violation, submitted either by a worker or a third party ("Complaint-Initiated Investigation"). <u>See</u> DRMC § 58-3(a)(1).

52.     In order to trigger a Complaint-Initiated Investigation, certain information *must* be set forth in the written complaint, including:

       a.      The worker's name and/or the name of their duly authorized representative, if applicable;

       b.      The worker's contact information;

       c.      A detailed statement of the employer or other person's alleged violation, including readily available supporting documentation demonstrating a violation; and

        d.     Any additional information requested by the Auditor or pursuant to rules issued by the Auditor.

See DRMC § 58-3(a)(1).

53.     The DRMC further provides that "[t]he burden of demonstrating to the auditor's satisfaction that a violation has occurred rests with the person making the complaint and shall be demonstrated by a preponderance of the evidence.  If a complaint is deemed credible by the auditor, the auditor shall notify the complained-of-party and shall provide a summary of findings regarding any such complaint to the complained-of-party, worker, and complainant, if applicable."  See DRMC § 58-3(a)(3).

54.     The second circumstance in which the Auditor may initiate an investigation is where the Auditor has a reasonable basis to believe that a wage theft violation has occurred ("Reasonable Basis Investigation").  See DRMC § 58-3(b).  The DRMC defines a reasonable basis as existing where:

        a.     The owner or partial owner of a legal entity has violated the terms of Chapter 58 with respect to another entity with common ownership interests;

        b.     A pattern and practice, including, but not limited to, receipt of multiple credible complaints filed against a particular industry, demonstrates an increased likelihood that certain workers within an industry are regularly not paid wages;

        c.     The Auditor receives credible information from a governmental agency that demonstrates an increased likelihood that a particular

employer or industry has failed to comply with the terms of Chapter 58; or

d.      The Auditor, relying upon data collected or received by the City, establishes a reasonable basis to conclude that a particular person or industry is likely to have failed to comply with the terms of Chapter 58.

See DRMC § 58-3(b)(1-4).

55.     Complaint-Initiated Investigations and Reasonable Basis Investigations are the *only* two types of civil wage theft investigations the Auditor has the authority to initiate pursuant to the DRMC.

56.     Denver Labor issued its own Civil Wage Theft Rules intended to outline the procedures and interpretations the City employs when enforcing the Civil Wage Theft Ordinance.  These rules sought to clarify Denver labor law and how Denver Labor, a division of the Auditor's Office, applies the ordinance.  However, the Colorado General Assembly did not grant local governments authority to regulate state overtime, wage theft, or other wage and hour matters beyond establishing a local minimum wage. Despite this, the Civil Wage Theft Rules contain provisions that improperly attempt to give Denver Labor the ability to enforce state wage laws.

57.     Denver's Civil Wage Theft Rules also introduce an enforcement structure that includes investigative procedures, penalties, and appeals—all handled by the Auditor's Office.  These provisions establish an independent enforcement scheme that directly conflicts with the DLSS's exclusive wage enforcement authority.

58.     Denver Labor also implemented its own Rules of Procedure for Appeals and Hearings, which took effect on June 22, 2023.  These procedures govern all administrative processes related to Chapter 58 of the DRMC.  Rather than adhering to the Colorado Administrative Procedures Act, as outlined in the CDLE Wage Order and COMPS Orders, the Auditor's Office established its own independent administrative framework.

59.     Neither the Civil Wage Theft Rules nor Denver Labor's Rules of Procedure for Appeals and Hearings were properly promulgated pursuant to the DRMC's notice and rulemaking authority.

**The Auditor Pushes City Council to Expand his Authority by Granting him Subpoena Power**

60.     On April 3, 2024, Bill No. 24-0476 was introduced in Denver City Council. The bill, backed by the Auditor's Office, was officially titled "An Ordinance Amending Chapter 58 to Authorize the Auditor to Issue Investigatory Subpoenas in Connection with the Enforcement of Certain Wage Violations" ("Subpoena Powers Bill").

61.     The Subpoena Powers Bill was passed by Denver City Council on April 29, 2024, and signed into law by the mayor on May 2, 2024.

62.     The Subpoena Powers Bill further amended Chapter 58 of the DRMC by granting the Auditor authority to issue investigatory subpoenas in connection with **certain** wage violations.

63.     The scope of the subpoena power conferred on the Auditor by DRMC § 58-4 is intended to be narrow.  Importantly, it did not provide unfettered access to all types of business records, as Denver Labor falsely communicates to businesses

together with its threats of "adverse inferences" and "fines" if requested records are not handed over, despite Denver Labor's complete lack of authority to request them.

64.     Rather, DRMC § 58-4 authorizes the Auditor to subpoena records related to certain wage investigations only after first submitting a written request to the employer and responding to any attempts by the business to confer.  See DRMC § 58-4(c)(1).

65.     The Subpoena Powers Bill was not the first—or the last—time the Auditor advocated obtaining or expanding his own subpoena power.

66.     For example, in May 2021, at the Auditor's request, Denver City Council granted the Auditor's Office subpoena power for the first time.  Later that year, after significant pushback from local businesses and community stakeholders, Denver City Council passed an amendment that would allow businesses to provide access to their confidential records on-site, rather than being forced to produce copies directly to the Auditor's Office.  The Auditor balked at this reasonable limitation on his subpoena power and filed a lawsuit in an effort to pressure Denver City Council to strike down the amendment.  Instead, Denver City Council repealed the bill in its entirety.

67.     The Subpoena Powers Bill was ultimately passed by a Denver City Council that was composed of different members than the one the Auditor sued three years prior.

68.     Within months of the Auditor successfully securing subpoena power for certain civil wage theft investigations through the Subpoena Powers Bill, the Auditor's Office pushed to expand its subpoena powers even further.

69.    In September 2024, Denver City Council passed a second bill granting the Auditor subpoena power, this time for performance audits.  In response to valid community concerns that the bill would give the Auditor's Office too much power, Denver City Council added an amendment that gave an audit committee, comprised of six members appointed by the mayor and the Auditor, oversight of the performance audit subpoena process.  Astonishingly, this same oversight does not apply to civil wage theft subpoenas issued pursuant to DRMC § 58-4.

### The Auditor Improperly Delegates his Exclusive Authority to Denver Labor and Director Fritz-Mauer

70.    Despite the clear language of the DRMC, which vests authority to investigate and enforce wage theft violations in *the Auditor*, an elected official, and *the Auditor alone*, the Auditor and the Auditor's Office have established an illegal policy of delegating this authority to Denver Labor and, more problematically, to Director Fritz-Mauer who, despite practicing as attorney in the past for Hearing Officer Kelman's small private practice law firm, is in a non-attorney position wielding governmental power under color of law which is entirely unchecked and unauthorized.

71.    Indeed, in flagrant disregard for the limits of his statutory authority, the Auditor has apparently delegated the *entirety* of his powers and responsibilities pursuant to Chapter 58 of the DRMC to the "Denver Labor division," led by Director Fritz-Mauer.

72.    Prior to being promoted—not appointed or elected—to serve as the Executive Director of Denver Labor, Director Fritz-Mauer was hired as the Labor Policy Director of Denver Labor in January 2023.  Before that, Fritz-Mauer practiced for fewer

than three years as an attorney at Hearing Officer Kelman's small private practice law firm, the Kelman Buescher Law Firm, in Denver, Colorado.

73.     The Auditor is a duly elected public official.  Fritz-Mauer is not.

74.     The Auditor's Office is duly authorized by Denver's City Charter, Article V. **Denver Labor is not.**

75.     Although the City Charter grants the Auditor the authority to appoint a deputy to exercise such powers that the Auditor specifically assigns, Director Fritz-Mauer has not been so appointed nor deputized.  See Denver City Charter § 5.2.1(G). Further, another person – not Director Fritz-Mauer – serves in the role of Deputy Auditor.

76.     Upon information and belief, no person who works for the "Denver Labor division" of the Auditor's Office been so appointed or deputized.

**Denver Labor Improperly Begins Investigating Plaintiff Clubs**

77.     On or about May 3, 2023, Denver Labor launched its investigations into Plaintiffs, beginning with Diamond Cabaret and PT's Showclub.

78.     Initially, Denver Labor represented to Diamond Cabaret and PT's Showclub—falsely—that it was conducting a "routine compliance audit."

79.     Instead, Denver Labor had surreptitiously initiated a targeted strategic enforcement investigation into Diamond Cabaret and PT's Showclub, without any initiating authority under the DRMC.

80.     By its own *ex post facto* explanation to Plaintiffs' legal counsel when Denver Labor was confronted months later regarding the source of the initiating

complaint, Denver Labor admitted that Director Fritz-Mauer initiated the civil wage theft investigation when he and other Denver Labor staff members decided amongst themselves that the hospitality industry was at "high risk" for wage theft.

81.    Director Fritz-Mauer admitted that he decided to focus on investigating strip clubs because he was personally "aware of significant empirical data establishing that strip clubs in particular are at high risk for misclassification and wage theft."  To identify his targets for his "strategic enforcement" he "researched what strip clubs there were in Denver, and [] opened up proactive investigations."

82.    In other words, the investigation was not an DRMC-authorized Complaint-Initiated Investigation, pursuant to which *the Auditor*—not Fritz-Mauer— would have been empowered to investigate Diamond Cabaret and PT's Showclub.

83.    The investigation was also not an authorized Reasonable Basis Investigation, which similarly would have authorized *the Auditor*—not Fritz-Mauer—to investigate Diamond Cabaret and PT's Showclub.  Not only was the investigation *not* precipitated by multiple credible complaints, *not* based on credible information from a government agency, and *not* based on data obtained by the Auditor, the Auditor was not even involved in the decision to initiate the investigations in any capacity.

84.    The "proactive" investigations, concealed as "routine compliance audits," ordered by Director Fritz-Mauer and initiated without the Auditor's involvement and outside of statutory authorities granted under the DRMC, targeted Plaintiff Clubs solely because of the industry in which they operate and not because of anything particular to the actual Plaintiff Clubs' operations or practices.

85.    Moreover, the investigation was not founded on a reasonable basis as defined by the DRMC, but on Director Fritz-Mauer's subjective and personal misogynistic beliefs that women in the adult entertainment industry cannot properly, knowingly, or reasonably contract for themselves.

86.    From its inception, Denver Labor's investigation into Plaintiff Clubs operated outside the statutory bounds of Chapter 58 of the DRMC.

87.    Indeed, no formal notice of investigation—as required by DRMC § 58-1(9)—was ever provided to either Diamond Cabaret or PT's Showclub.

88.    On June 15, 2023, Denver Labor issued "Failure to Pay Minimum Wage and Additional Information Request" letters to Diamond Cabaret and PT's Showclub.  In addition to misrepresenting that the letters were sent in follow up to its "routine compliance audit," the letters also requested documents including workers' contact information, scheduling information, wage and tax records, and documentation on policies dating back to December 1, 2021.

89.    On June 28, 2023, Denver Labor opened a separate, concurrent investigation also misnomered as a "routine compliance audit" into PT's Showclub Centerfold.

90.    No formal notice of investigation—as required by DRMC § 58-1(9)—was provided to PT's Showclub Centerfold.

91.    Instead, Denver Labor issued a "Failure to Pay Minimum Wage and Additional Information Request" letter to PT's Showclub Centerfold, requesting the same information it sought from Diamond Cabaret and PT's Showclub.

92.     On August 9, 2023, and August 10, 2023, Diamond Cabaret and PT's Showclub voluntarily responded to Denver Labor's requests by providing hundreds of employee documents to Denver Labor under the auspices of a routine compliance audit.

93.     Similarly, on September 1, 2023, PT's Showclub Centerfold voluntarily responded to Denver Labor's request by providing its employee documents to Denver Labor also under the auspices of a routine compliance audit.

94.     Eight months later—during which time the Auditor was busy acquiring his new subpoena powers—Denver Labor finally responded to Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold regarding the provided documentation.

95.     Specifically, on May 15, 2024, less than two weeks after the Auditor's new subpoena powers were signed into law, Denver Labor issued Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold "Additional Information Request Letters." These letters sought information not about employees, but about the entertainers who perform at the Plaintiff Clubs.  Denver Labor demanded a response by June 21, 2024.

96.     In the letters, Denver Labor requested "signed lease agreements, payment records, hours worked, contact information, classification details, and pay records (including tips and deductions) for all entertainers/performers."

97.     Denver Labor did not request a certified copy of payroll records, which the Auditor—not Denver Labor—is authorized to request pursuant to DRMC § 58-2(c)(2).

98.     Denver Labor further broadened the scope of its records request by increasing the date range for records sought, backward to May 3, 2020, for PT's

Showclub and June 28, 2020, for PT's Showclub Centerfold, despite having no statutory authority to do so and despite Plaintiff Clubs previously informing Denver Labor that Plaintiff Clubs were each under different ownership prior to July 2021.

99.    On May 29, 2024, Plaintiff Clubs responded to Denver Labor through their counsel.  Plaintiff Clubs informed Denver Labor that they were contractually prohibited from providing personal contact information for entertainers.  Plaintiff Clubs further explained that the entertainers were not employees or "workers" as contemplated by the DRMC, but rather licensees who paid a site rental fee in order to rent performance time and space at the Plaintiff Clubs' locations.

100.    Plaintiff Clubs also put Denver Labor on notice that their agreements with the entertainers were protected by a strict confidentiality clause, and that releasing confidential and personal entertainer information without all parties' consent would breach this agreement.

101.    Plaintiff Clubs asked Denver Labor to withdraw its improper request for entertainer information which was not authorized under the DRMC, but affirmed they would voluntarily participate with Denver Labor by providing additional documentation for their actual employees.

102.    Indeed, on June 14, 2024, the Plaintiff Clubs submitted additional documentation related to employees to Denver Labor.

103.    Nonetheless, Denver Labor issued "Final Notices to Provide Payroll Records" to Plaintiff Clubs on June 17, 2024, specifically directed at confidential

entertainer records.  These notices warned that the failure to provide "a complete and certified payroll" for entertainers would result in $1,000.00 per day penalties.

104.    Despite repeatedly informing Denver Labor that entertainers are not employees and all records requested were subject to contractual confidentiality restrictions that had not been waived by the entertainers or Plaintiff Clubs, Denver Labor, acting wholly outside of the Auditor's statutory authorities under the DRMC, subsequently imposed excessive daily fines and penalties against Plaintiff Clubs.

***Denver Labor Unlawfully Attempts to Wield the Auditor's New Subpoena Power***

105.    On June 18, 2024, one day after Denver Labor issued its Final Notices to Provide Payroll Records, it issued three Subpoenas for Records, Documents, and/or Tangible Things ("First Subpoenas"), one to each of Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold.

106.    The First Subpoenas were in fact the *very first* subpoenas the City issued to private employers following the passage of the Subpoena Powers Bill.  In contravention of the DRMC, the subpoenas were issued ***not by the Auditor***, but by Denver Labor.

107.    The First Subpoenas requested, not "certified payroll records," as arguably would have been permitted by DRMC § 58-2(c)(2) and § 58-4(c)(1) if issued by the Auditor, but instead, Denver Labor sought copies of all signed lease agreements with entertainers, records of all payments made from or to entertainers, contact information for all entertainers, an explanation and legal basis for the classification of entertainers, and tip pooling policies.

108.    In response to the First Subpoenas and to the Final Notices to Provide Payroll Records, Plaintiff Clubs explained comprehensively why entertainers are not employees or "workers" as defined by DRMC § 58-1(11).

109.    Unlike the Plaintiff Clubs' employees, entertainers manage and create their own schedules and choose where they want to perform via a third-party app called Pole Position, perform for tips directly from customers rather than wages from the Clubs, and pay a site rental fee in order to rent performance time and space at the Plaintiff Clubs' locations.

110.    Plaintiff Clubs' responses put Denver Labor on notice that it was requesting information it did not have the legal or statutory authority to seek.

111.    Plaintiff Clubs also reiterated that they were prohibited from violating the confidentiality clauses of their license agreements with entertainers.

112.    Plaintiff Clubs' efforts to narrow the scope of Denver Labor's overreaching investigation to the confines of the law were ultimately in vain.  Denver Labor ignored Plaintiff Clubs' arguments about the entertainers' contractual status as licensees, despite asking for this information in its First Subpoenas.

113.    Denver Labor further dismissed the validity of the entertainers' privacy and confidentiality interests by continuing to insist that Plaintiff Clubs turn over confidential information and records regarding entertainers, despite the contrary contractual obligations Plaintiff Clubs unequivocally owed the entertainers.

***Denver Labor Illegally Imposes $1,000-per-day Fines Against Plaintiffs***

114.    On June 27, 2024, Denver Labor sent penalty determination letters to Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold ("First Penalty Determinations").

115.    The First Penalty Determinations imposed excessive and illegal $1,000-per-day fines on Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold, retroactively from June 22, 2024.

116.    The First Penalty Determinations purported to impose these exorbitant $1,000-per-day fines pursuant to DRMC § 58-4(d)(1).

117.    DRMC § 58-4(d)(1), however, authorizes **the Auditor**—not Denver Labor, and not a division of the Denver Auditor's Office—to impose a daily penalty of up to $1,000 "for failure to furnish the auditor a complete and certified payroll pursuant to section 58-2(c)(2)(b) or for failure to comply with a subpoena issued pursuant to subsection (c)."

118.    The First Penalty Determinations do not make clear whether the fines were imposed for "failure to furnish the auditor a complete and certified payroll record," or for "failure to comply with a subpoena."

119.    In either event, the $1,000-per-day fines were not authorized because, as required by the express language of the DRMC, **the Auditor** did not request **complete and certified payroll records** from any of Plaintiff Clubs, nor did **the Auditor** issue any of Plaintiff Clubs a **lawful** subpoena.

120.    Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold timely submitted Petitions to Appeal the Penalty Determinations pursuant to the DRMC on July 26, 2024, challenging Denver Labor's egregious abuse of **the Auditor's** powers.

***Denver Labor and Director Fritz-Mauer Hire Director Fritz-Mauer's Former Employer to Serve as Denver Labor's Hearing Officer***

121.    On July 9, 2024, Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold filed respective Motions to Quash [First] Subpoenas ("Motions to Quash First Subpoenas") and requested that a Hearing Officer be appointed pursuant to DRMC § 58-4(c)(2).

122.    Plaintiff Clubs argued that the First Subpoenas were overly broad, unduly burdensome, requested information that did not exist, and sought the disclosure of confidential information.  Plaintiff Clubs further argued that Denver Labor was not entitled to confidential documents entertainers who have negotiated their own legal contractual status and who are not covered by the DRMC and Denver Labor's requests.

123.    On July 11, 2024, in response to the Motions to Quash First Subpoenas, a Denver Assistant City Attorney representing Denver Labor contacted counsel for Plaintiff Clubs regarding the selection of a Hearing Officer.

124.    The Denver Assistant City Attorney informed Plaintiff Clubs that the Hearing Officer whom Director Fritz-Mauer selected himself was his former supervisor and employer, Ellen Kelman.

125.    Specifically, the Denver Assistant City Attorney informed Plaintiff Clubs that Fritz-Mauer worked for Hearing Officer Kelman at the Kelman Buescher Law Firm for nearly three years, immediately before he joined Denver Labor.

126.    The Kelman Buescher Law Firm is a small firm with fewer than five attorneys, and Hearing Officer Kelman, as a partner, supervised Fritz-Mauer directly.

127.    Fritz-Mauer worked as Hearing Officer Kelman's associate until October 31, 2022, then remained on unpaid medical leave at the Kelman Buescher Law Firm through mid-December 2022.  Director Fritz-Mauer began working at Denver Labor the very next month.

128.    In other words, the Executive Director of Denver Labor hand-selected his most recent former boss to preside over the very first subpoena dispute in an investigation that he personally decided to initiate.  The appearance of impartiality was clear and obvious.

129.    Nonetheless, on July 12, 2024, Director Fritz-Mauer issued a work order requested Ellen Kelman to accept appointment as a hearing officer with respect to the Motions to Quash First Subpoenas.  Ellen Kelman accepted the appointment the same day and did not make any of her own disclosures about her prior employment relationship with Director Fritz-Mauer.

130.    Based on Director Fritz-Mauer's long-term direct working relationship with Hearing Officer Kelman, Plaintiff Clubs were compelled to file a Motion for Recusal of Hearing Officer Ellen Kelman ("First Motion for Recusal") on July 16, 2024.

131.    The First Motion for Recusal requested Hearing Officer Kelman to recuse herself under Rule 6.5 of the Denver Auditor's Office Rules of Procedure for Appeals and Hearings based on the appearance of partiality and the nature of the prior

relationship between the Director of Denver Labor and what was supposed to be a neutral and independent hearing officer.

132.    In its response, Denver Labor admitted that Hearing Officer Kelman supervised Director Fritz-Mauer directly when he worked at her law firm, but argued that because the investigation into Plaintiff Clubs did not start until after Director Fritz-Mauer left Hearing Officer Kelman's law firm, it would have been impossible for them to discuss the matter. Therefore, Denver Labor reasoned, Hearing Officer Kelman was not obligated to recuse herself.

133.    In a declaration submitted in support of Denver Labor's response, Director Fritz-Mauer stated: "I know Ellen Kelman. Ms. Kelman was one of my supervisors at Kelman Buescher. During my time working with her, we often disagreed on case strategy and legal analysis."

134.    Despite Director Fritz-Mauer's attempt to minimize his prior relationship with Hearing Officer Kelman, his declaration emphasized the extent of their prior working relationship and revealed that Hearing Officer Kelman had direct input into his work and development.

135.    Within mere hours of Denver Labor submitting its response, Hearing Officer Kelman denied the First Motion for Recusal. This would prove to be just the first of the 99.9% of rulings Hearing Officer Kelman made in favor of Denver Labor.

136.    Hearing Officer Kelman somehow concluded that objectively, there was no appearance of impropriety in a situation where she directly, and recently, supervised the

28

Executive Director of one of the parties to a dispute she was called upon to decide as an impartial Hearing Officer.

137.   Hearing Officer Kelman based her conclusion, in part, on her assumption that she would not need to assess Director Fritz-Mauer's credibility in her role as Hearing Officer.  This would turn out to be patently untrue.

***Hearing Officer Kelman does not Curb Denver Labor's Overreaching Practices, and Instead Rubber-Stamps its Illegal Investigations***

138.   As Plaintiff Clubs contemplated what to do following Hearing Officer Kelman's refusal to recuse herself, on August 9, 2024, Hearing Officer Kelman requested that Denver Labor and Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold attend a prehearing conference in advance of the hearing on the Motions to Quash First Subpoenas.

139.   Director Fritz-Mauer attended this prehearing conference, which was intended for counsel as far as Plaintiff Clubs were aware, and Hearing Officer Kelman spoke to him directly about the issues rather than address the Assistant City Attorney who was present and representing Denver Labor.

140.   Hearing Officer Kelman also consistently referred to Director Fritz-Mauer as "Matt," further indicative of her familiarity with him and disregard for the appearance of impartiality and formalities of serving as a neutral and independent hearing officer.

141.   At the prehearing conference, Hearing Officer Kelman *sua sponte* announced that based on the pleadings, she had concerns regarding Denver Labor's legal authority to initiate the investigations and questioned whether she had the authority to hear the matter at all.  Hearing Officer Kelman's voluntary musings signaled

to Denver Labor the weaknesses in its case and afforded it a chance to cure its deficient arguments well in advance of the hearing, which Hearing Officer Kelman later determined Denver Labor had sufficiently cured.

142.    In an email on August 13, 2024, Hearing Officer Kelman cemented the parameters of the upcoming August 22, 2024, hearing to two issues: (1) whether the argument regarding Denver Labor's authority was properly before her, and (2) if it was, whether Denver Labor had the authority to initiate its investigations and issue the First Subpoenas.

143.    Denver Labor submitted two exhibits prior to the hearing: (1) Declaration of Matthew Fritz-Mauer in Support of Denver Labor's Legal Authority to Conduct The Present Investigations Under D.R.M.C. § 58-3 ("Fritz-Mauer Declaration"); and (2) Erin Mulvaney and Andrew Wallender, Strippers Winning Employee Status Challenges Gig Economy's Norms, Daily Labor Report, Oct. 21, 2019 ("2019 Daily Labor Report").

144.    The Fritz-Mauer Declaration placed Director Fritz-Mauer's credibility at the forefront of the Plaintiff Clubs' dispute with Denver Labor, despite Hearing Officer Kelman's previous reliance on her assertion that his credibility would not be at issue in the case in an attempt to justify her failure to recuse herself.

145.    The Fritz-Mauer Declaration read as though laying the foundation for expert testimony, highlighting his accolades and portraying his academic and personal experience as authoritative justification for initiating Denver Labor's investigations.

146.    Indeed, the Fritz-Mauer Declaration made it clear that he initiated the investigations into the Clubs not based on any data collected or received by the City, but on his own personal beliefs and past experiences in other locations.

147.    The Fritz-Mauer Declaration unequivocally did not provide legal justification for Denver Labor's investigation into Plaintiff Clubs in the absence of a formal complaint as required by the DRMC.  Instead, it referenced a chance encounter with an anonymous woman who identified herself as a stripper during a conversation with Director Fritz-Mauer in Spring 2023.  Director Fritz-Mauer admitted he was unable to contact this woman again and had no information about where she worked. Nevertheless, he cited this encounter as the event that prompted his decision to initiate the investigations into Plaintiff Clubs, despite later stating that his plans to target adult entertainment clubs started in the first three months of 2023.

148.    The submission of the 2019 Daily Labor Report was even more confusing. The Daily Labor Report is a 2019 article that discusses exotic dancers and Fair Labor Standards Act lawsuits, focusing on individuals in California, Georgia, and New York, as well as cases in the Third, Fourth, Fifth, and Ninth Circuits—not in the past five years, not in Colorado, and certainly not in Denver.

149.    Denver Labor outright failed to submit persuasive evidence that it had the authority to initiate its investigations and demand Plaintiff Clubs' records pursuant to DRMC §§ 58-3 and 58-4.  Any reasonable, impartial, and independent Hearing Officer would have found as much and would have disregarded the self-serving statement of the very person who offered it to justify his own initiation of an unauthorized

investigation.  Further, the Hearing Officer completely ignored the fact that the purported declaration was neither signed nor sworn under oath.

150.    But at the August 22, 2024, hearing on the Motions to Quash First Subpoenas, Hearing Officer Kelman took a different approach.  During the course of the hearing, Hearing Officer Kelman *sua sponte* suggested to Denver Labor that it move to modify the First Subpoenas, made her own legal arguments to disregard Plaintiff Clubs' confidentiality agreements with entertainers, and expanded the scope of issues argued at the hearing without giving Plaintiff Clubs fair notice or an opportunity to meaningfully respond.

151.    On August 28, 2024, smartly taking the obvious cues from Hearing Officer Kelman and adopting her comments and arguments offered during the hearing as its own, Denver Labor made a formal motion to modify the First Subpoenas.

152.    On September 3, 2024, Hearing Officer Kelman issued her Order denying the Motions to Quash First Subpoenas.

153.    Hearing Officer Kelman's Order concluded that Denver Labor did indeed have the authority to initiate its investigations into Plaintiff Clubs, despite her comments at the prehearing conference.  Hearing Officer Kelman made a point to minimize her clear bias in favor of Director Fritz-Mauer by stating that her decision was not based **solely** on his unsworn self-serving declaration, but because the 2019 Daily Report article supported his unsworn declaration.

154.    Confusingly, Hearing Officer Kelman reasoned that the 2019 Daily Report article was not too old to support an investigation initiated by Director Fritz-Mauer in

2023, despite the article's lack of connection to the parties, subject matter, law, ordinances, and jurisdiction.

155.    In denying the Motions to Quash First Subpoenas based on two clearly problematic and unpersuasive pieces of "evidence," Hearing Officer Kelman rubber-stamped Denver Labor's improper use of the Auditor's limited authority under Chapter 58 of the DRMC.

***Denver Labor Expands its Investigations into the other Plaintiffs***

156.    On July 8, 2024, Denver Labor expanded its investigation into Rick's Cabaret, requesting documents including workers' contact information, scheduling information, wage and tax records, and documentation on tip pooling policies going back to July 8, 2021.

157.    Just like its investigation into the others, Denver Labor's investigation into Rick's Cabaret was similarly unlawfully initiated by Director Fritz-Mauer.

158.    On August 14, 2024, Rick's Cabaret submitted responsive documentation for its employees.

159.    On August 15, 2024, Denver Labor issued an "Incomplete Response to Request for Records" letter, requesting information regarding entertainers.

160.    On the same day, Denver Labor issued its first Subpoena for Records, Documents, and/or Tangible Things to Rick's Cabaret ("Rick's Cabaret First Subpoena") requesting nearly identical information it sought from the other three clubs – copies of all signed lease agreements with entertainers, records of all payments made from or to

entertainers, contact information for all entertainers, an explanation and legal basis for the classification of entertainers, and tip pooling policies.

161. On August 30, 2024, Rick's Cabaret timely filed its Motion to Quash First Subpoena, which was then mooted on September 3, 2024, when Denver Labor withdrew the Rick's Cabaret First Subpoena after Hearing Officer Kelman issued her Order regarding the other three clubs.

162. Also on September 3, 2024, Denver Labor issued "modified" Subpoenas for Records, Documents, and/or Tangible Things to Diamond Cabaret, PT's Showclub, PT's Showclub Centerfold, and Rick's Cabaret ("Modified Subpoenas").

163. Plaintiff Clubs filed timely Motions to Quash the Modified Subpoenas on September 24, 2024.

164. That same day, nearly two months after Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold filed their Petitions to Appeal the First Penalty Determinations – after securing the first favorable ruling from Hearing Office Kelman other than her refusal to recuse herself – Director Fritz-Mauer issued a work order for Hearing Officer Kelman to next handle Plaintiff Clubs' appeals of the First Penalty Determinations.

165. Director Fritz-Mauer then, not surprisingly, hand-selected Hearing Officer Kelman to handle Plaintiff Clubs' Motions to Quash the Modified Subpoenas.

166. On October 11, 2024, Plaintiff Clubs submitted new Motions for Recusal of Hearing Officer Ellen Kelman in re Petitions to Appeal Penalty Determinations, again based on her prior working relationship with Director Fritz-Mauer but further bolstered

by her clearly biased behavior toward, and *sua sponte* suggestions and arguments in favor of, Denver Labor during the prior proceedings with Plaintiff Clubs.

167.    Hearing Officer Kelman summarily refused to recuse herself in an order denying the Motion for Recusal on October 23, 2024 in which she accused Plaintiff Clubs of making "derogatory" characterizations regarding her appointment and in which creates statements of authority out of whole cloth, such as "Denver Labor is the enforcement arm of the auditor's office for D.R.M.C § 58" and "Dr. Fritz-Mauer, as Executive Director of that office, appoints hearing officers."  Neither of these statements have any basis in the DRMC or the City Charter.

168.    Emboldened by his former boss' approval of Denver Labor's unauthorized use of **the Auditor's** limited subpoena power, Director Fritz-Mauer expanded his crusade against Plaintiffs even further beyond the bounds of the DRMC.

169.    On September 9, 2024, Denver Labor issued a subpoena to IndyWork, Inc. dba Pole Position ("Pole Position").  Pole Position is a developer of an app that works as a digital bulletin board to connect entertainers with adult entertainment clubs such as Plaintiff Clubs. Diamond Cabaret uses Pole Position to connect with entertainers, which Director Fritz-Mauer knew.

170.    Pole Position is a third-party app that does not employ entertainers, which Director Fritz-Mauer also knew and, indeed, explicitly acknowledged to Pole Position's creator in prior correspondence.

171.    Chapter 58 of the DRMC only authorizes **the Auditor** to subpoena records that are in the custody of an *employer*.  See DRMC § 58-4(c).

172.    Nonetheless, in Denver Labor's subpoena to Pole Position, it requested any and all information, including schedules, timecards, and contact information, for all entertainers who "worked at Diamond Cabaret."

173.    Not only was Denver Labor's subpoena to Pole Position, like its subpoenas and modified subpoenas to Plaintiff Clubs, unauthorized because it was not issued by **the Auditor**, but it was also unauthorized because it was issued to a non-employer third party.  Chapter 58 of the DRMC unequivocally does not give the Auditor, let alone Denver Labor, the power to issue third-party subpoenas.

174.    Director Fritz-Mauer knew this but intentionally disregarded the law in his attempt to gather confidential information from Diamond Cabaret through a backdoor channel.

175.    After both Pole Position and Diamond Cabaret filed respective motions to quash the subpoena issued to Pole Position, Director Fritz-Mauer voluntarily withdrew it, signaling that he indeed knew it was an entirely unauthorized abuse of government power to issue it in the first place.

176.    Over the ensuing weeks, Denver Labor and Director Fritz-Mauer began inundating Plaintiff Clubs with an endless barrage of weekly emails, additional information requests, letters opening "new" investigations, follow up requests, investigations into individual managers, unfounded accusations of retaliation for nearly every regular business decision made by Diamond Cabaret and Rick's Cabaret, and multiple additional penalty determinations.

177.    All told, as of the filing of this Complaint, Denver Labor and/or Defendant Fritz-Mauer have sent counsel for Plaintiffs over **121** separate written communications in relation to its investigations into Plaintiffs.  Of the 121 communications, 80 of those came after the issuance of Hearing Officer Kelman's Order denying the Motions to Quash First Subpoenas on September 3, 2024.

178.    Nearly all of the communications that demanded additional information consisted of multiple subparts and asked for information and records far beyond the scope of what even **the Auditor** is authorized to request under the DRMC.

179.    Nearly all of the communications that demanded a response imposed arbitrary and overlapping deadlines for Plaintiffs to gather and produce documents, answer dozens of interrogatory-form questions, and otherwise provide all manner of confidential and/or irrelevant information to Denver Labor, blatantly designed as fishing expeditions and probing into matters that having no rational relation to any provision of Chapter 58 of the DRMC.

180.    Plaintiffs complied with the very small number of Denver Labor's requests that appeared somewhat authorized under the DRMC, despite none of them coming from the Auditor, while maintaining their vehement objections to the legality of the requests.

181.    Plaintiffs, however, steadfastly maintained their position that Denver Labor was not entitled to confidential entertainer information.  Nearly every response Plaintiffs sent to Denver Labor was met with an immediate follow-up communication that sought even more information and imposed an even shorter arbitrary deadline to provide it.

182.    On November 15, 2024, in violation of the administrative stay under the DRMC because of Plaintiff Clubs' pending internal appeals with Denver Labor, Dever Labor issued an excessive, unauthorized, and duplicative Penalty Determination to Rick's Cabaret.

183.    On December 10, 2024, Denver Labor issued four additional excessive, unauthorized, and duplicative Penalty Determinations against all four Plaintiff Clubs, including Rick's Cabaret, again in violation of the administrative stay under the DRMC.

184.    On January 3, 2025, Denver Labor expanded its overreach even further when it initiated an investigation into Mr. Duerbusch, the General Manager of Diamond Cabaret, attempting to establish individual liability for Mr. Duerbusch in two of its investigations.

185.    Between January 10 and January 20, 2025, Denver Labor issued three more entirely unsupported penalty determinations against Diamond Cabaret and Mr. Duerbusch for purported retaliation against two bartenders and one entertainer.

186.    In the penalty determination regarding the entertainer, the allegation was that Mr. Duerbusch took a $10 tip meant for her.  The ten dollars, however, was intended for Mr. Duerbusch, and there was no credible evidence to the contrary. Despite this, Denver Labor imposed fines and penalties against Diamond Cabaret and Mr. Duerbusch for this $10 dispute of up to $8,040.11, with $40.11 payable to the entertainer, and $8,000 going directly into Denver Labor's coffers.

187.    In the penalty determinations related to the bartenders, Denver Labor erroneously found that the bartender who was laid off due to lack of work, and the other

who was terminated because of multiple coworker complaints about her disruptive behavior in addition to her multiple alcohol-serving policy violations, were terminated in retaliation for talking to Denver Labor.  None of these unfounded conclusions, which led to even more excessive penalties and fines mostly payable to Denver Labor, were supported by evidence or provided any semblance of due process to Diamond Cabaret and Mr. Duerbusch.

188.    The entertainer and bartender penalty determinations have each been administratively appealed pursuant to DRMC § 58-5(a).

### Hearing Officer Kelman Upholds Denver Labor's Unauthorized First Penalty Determinations after a Sham "Hearing"

189.    Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold's petitions to appeal the First Penalty Determinations, filed on July 26, 2024, were set for a two-day evidentiary hearing before Hearing Officer Kelman to begin on January 22, 2025.

190.     On January 3, 2025, Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold submitted their Motion *in Limine*, challenging the relevance of dozens of Denver Labor's exhibits, which included information and evidence created *after* the First Penalty Determinations.

191.    On January 6, 2025, Denver Labor submitted its Motion to Strike Testimony of Auditor Timothy O'Brien, who Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold identified as a witness in their witness list.

192.    Hearing Officer Kelman denied the Clubs' Motion *in Limine* on January 15, 2025.

39

193.    Hearing Officer Kelman also denied Denver Labor's Motion to Strike the testimony of the Auditor but substantially and substantively limited his testimony, thereby restricting critical testimony and arguments that Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold intended to use to prove Denver Labor's lack of authority and its overreach.

194.    Diamond Cabaret, PT's Showclub, and PT's Showclub Centerfold were prepared for a two-day evidentiary hearing on January 22 and 23, to present their appeal of the First Penalty Determinations.  However, at the outset of the hearing, Hearing Officer Kelman made unreasoned rulings, contrary to Denver Labor's own procedures for Hearing and Appeals, that severely limited Plaintiff Clubs' ability to present their arguments, including prohibiting preserved arguments related to Denver Labor's complete lack of statutory authority to issue the penalties.

195.    The Clubs' Petitions to Appeal the Penalty Determinations explicitly stated the following:

> The Petition does not set forth the sole and complete substance of the Company's arguments on appeal.  ***Pursuant to D.R.M.C. § 58-5(a), and Denver Labor's Rules of Procedure for Appeals and Hearings 4.5, this Petition is a short and plain statement and is not intended to be exhaustive.***  The Company reserves the right to make such additional and further arguments on appeal as the facts and law allow.

196.    At no time did Denver Labor contest this reservation of rights. Notwithstanding this clear reservation of rights which was never challenged or objected to by Denver Labor, Hearing Officer Kelman *sua sponte* ruled that Plaintiff Clubs waived

their argument regarding whether Denver Labor had statutory authority to issue the penalties.

197.    The Hearing Officer wrongly stated that because the argument that only the Auditor was authorized under the DRMC to issue penalties was not expressly set forth in Plaintiff Clubs' short and plain non-exhaustive petitions to appeal, it was waived. This ruling was arbitrary and capricious and violated Plaintiff Clubs' due process and Constitutional rights and privileges.

198.    Hearing Officer Kelman continued to take actions and conduct herself in a manner that undermined the entire legitimacy and legality of the "hearing."

199.    For example, during the hearing, Plaintiff Clubs requested an order for sequestration of nonparty witnesses, which was expressly permitted by Denver Labor's own Rules of Procedure for Appeals and Hearings, because many of Denver Labor's witnesses were attending the hearing online.

200.    Hearing Officer Kelman summarily denied the sequestration request, stating that just requesting sequestration of witnesses "improperly presume[s] that witnesses are going to lie."  This ruling ignored the well-established purpose of sequestration: to ensure independent testimony and prevent undue influence.

201.    During the hearing, the Auditor testified and admitted that he never requested certified payroll records, in contravention of the DRMC.

202.    The Auditor further testified that Denver Labor's penalties were imposed without his review or approval, contrary to the requirements under the DRMC.

203.    The Auditor's testimony was cut off and limited by Hearing Officer Kelman, who sustained objections on the relevance of Denver Labor's legal authority, effectively suppressing critical relevant testimony from the Auditor on the basic functions of his position as Auditor and his authority (and lack thereof) to delegate his authority to Denver Labor.

204.    Director Fritz-Mauer testified regarding the definition and requirements of certified payroll records, revealing significant and critical gaps in Denver Labor's compliance with the DRMC in initiating the investigations, making document requests, and ultimately in issuing the excessive penalties that were the very subject of the appeal "hearing."

205.    Director Fritz-Mauer 's testimony confirmed that:

a.    Neither the Auditor nor Denver Labor formally requested "certified payroll records" before issuing penalties;

b.    Plaintiff Clubs were not informed that failure to produce specific "certified payroll records" would result in penalties; and

c.    The penalties issued against Plaintiff Clubs were based on Denver Labor's assumption that unspecified records should have been provided, even though there was no formal demand under DRMC § 58-4(d)(1).

206.    When asked whether Denver Labor ever defined "certified payroll records" in any of its written requests to Plaintiff Clubs, Director Fritz-Mauer was unable to provide any documentary evidence showing that Denver Labor had properly

communicated its requirements before excessively and illegally penalizing Plaintiff Clubs to the tune of thousands of dollars.

207. Director Fritz-Mauer's testimony exposed a fatal procedural flaw in Denver Labor's penalty determinations, as the DRMC only authorizes penalties for an employer's failure to provide properly requested certified payroll records by **the Auditor**—a step that Denver Labor failed to take.

208. Plaintiff Clubs' argument at the hearing emphasized that:

    a.    Without a clear and specific request for certified payroll records by the Auditor, no penalty could lawfully be imposed;

    b.    The DRMC does not permit Denver Labor to issue penalties for failing to provide unspecified payroll records that do not meet the statutory definition of certified payroll records;

    c.    Denver Labor's actions amounted to a violation of due process, as Plaintiffs were penalized without adequate notice or a meaningful opportunity to comply with a proper request; and

    d.    Entertainer logins and contracts are not "certified payroll records," under the DRMC.

209. Throughout the testimony of both the Auditor and Director Fritz-Mauer, Hearing Officer Kelman repeatedly interrupted testimony, interrupted counsel's questions, made her own legal arguments to bolster Denver Labor's objections, and even asserted her own objections to Plaintiff Clubs' counsel's questions to the witnesses.

210.    Plaintiff Clubs' counsel made an opening statement and called two witnesses to present their appeal.

211.    Denver Labor's counsel made no opening remarks and did not ask a single question of either of Plaintiff Clubs' witnesses.  They offered zero evidence at the hearing.  Despite this, at the close of Plaintiff Clubs' presentation of evidence, Denver Labor moved for a directed verdict but later represented that it was meant to be a motion for judgment as a matter of law ("JMOL").

212.    Unlike a request for sequestration, neither a directed verdict nor a JMOL is authorized under Denver Labor's Rules of Procedure for Appeals and Hearings.

213.    To this additional unauthorized act by Denver Labor, Plaintiff Clubs objected to the improper motion, arguing that they had presented sufficient evidence to demonstrate Denver Labor's lack of statutory authority to impose the penalties, and that there were genuine factual disputes requiring resolution after post-hearing briefing.

214.    Despite the fatal admissions from Director Fritz-Mauer during the hearing regarding his lack of authority and compliance with the DRMC, Hearing Officer Kelman granted Denver Labor's JMOL in a verbal order, thereby precluding further evidentiary review of these deficiencies and allowing the excessive and unconstitutional takings in the form of penalties to stand, despite the complete absence of a lawful basis under the DRMC.

215.    Hearing Office Kelman's verbal ruling ignored:

a.   The fact that material factual disputes remained regarding the legal classification of entertainers and the legality of Denver Labor's requests for documents other than certified payroll records;

b.   The due process concerns raised by denying Plaintiff Clubs the ability to challenge Denver Labor's statutory authority to issue penalties; and

c.   The procedural irregularities in Denver Labor's investigatory process, including its failure to comply with DRMC's explicit requirements for initiating wage investigations.

216.   Prior to granting Denver Labor's JMOL motion, Hearing Officer Kelman requested to hear from Plaintiff Clubs, who objected to the procedurally improper motion and requested post-hearing briefing as expressly contemplated by Denver Labor's Rules of Procedure for Appeals and Hearings, unlike a JMOL motion.

217.   Hearing Officer Kelman granted Denver Labor's JMOL after preventing Plaintiff Clubs to present their arguments on appeal and improperly restricting and directing witness testimony.

**_Denver Labor's Emboldened Harassment and Unlawful Overreach_**

218.   After the sham hearing, Denver Labor immediately commenced its harassment campaign, this time targeting other individuals, RCI, and Big Sky as well as Plaintiff Clubs.

219.   The next day after the hearing, Director Fritz-Mauer sent two new demands for information to Diamond Cabaret and Rick's Cabaret for information to

which Denver Labor is not entitled, specifically regarding bank accounts and financial information, contracts between affiliated entities, and other proprietary, private, confidential, and irrelevant information. Denver Labor closes its request with threats that it intends to impose adverse inferences and fines. The requests are entirely unauthorized under Chapter 58 of the DRMC.

220. On February 3, 2025, Denver Labor sent further demands for information regarding an employee retaliation complaint that was fabricated by Denver Labor and falsely represented by Denver Labor as being employee-initiated.

221. On February 5, 2025, Denver Labor sent an additional request for information demanding responses to interrogatory-style questions about Rick's Cabaret's alleged internal portal and IT services and the existence of any and all written policies no matter the subject matter or topic. Denver Labor closes its request with threats that it intends to impose adverse inferences and fines for failure to provide the requested information. The requests are entirely unauthorized under Chapter 58 of the DRMC.

222. On February 6, 2025, Denver Labor sent an additional request for information regarding Diamond Cabaret's IT providers, onsite ATM ownership, audio, sound, and lighting installers, and targeting other individuals who work at Plaintiff Clubs. Denver Labor closes its request with threats that it intends to impose harmful inferences.

223. On February 12, 2025, Denver Labor sent an additional request for information regarding Rick's Cabaret's IT providers, onsite ATM ownership, audio,

sound, and lighting installers, and targeting other individuals who work at Plaintiff Clubs. Denver Labor closes its request with threats that it intends to impose harmful inferences.

***Denver Labor Resorts to Creating Fraudulent Calculations to Punish Plaintiffs for Requiring Denver Labor's Compliance with the Law***

224.    On February 26, 2025, Denver Labor issued a press release and published on its website penalty determinations against Diamond Cabaret and Rick's Cabaret and claimed publicly that "Diamond Cabaret and Rick's Cabaret strip clubs have engaged in widespread wage theft harming its entertainers, bartenders, servers, and other workers."  This statement is unequivocally false.

225.    Denver Labor published these penalty determinations to the public and had already published online videos and media statements prior to providing them to Plaintiff Clubs' counsel, effectively depriving the affected businesses of any meaningful opportunity to respond before the media and public were misled by Denver Labor's distorted and demonstrably false narrative.

226.    Adding to this gross abuse of power, Denver Labor's February 26, 2025 penalty determinations included four spreadsheets that erroneously assessed millions of dollars in penalties—errors so blatant and pervasive that they cannot be dismissed as mere mistakes. The most egregious among them was Denver Labor's complete failure to account for employees' earned tips and overtime payments, resulting in a wildly inflated and fraudulent assessment of purported "wage theft."

227.    Beyond these fundamental miscalculations, Denver Labor's spreadsheets contained duplicate entries, incorrect pay periods, and inconsistent applications of

47

formulas—further distorting the figures to manufacture an exaggerated claim of wrongdoing. Without question, additional errors will be uncovered upon further examination, as Denver Labor's slipshod approach to enforcement continues to unravel.

228.    But its fraudulent tactics did not stop at mere omission. The spreadsheets included hundreds of duplicate entries—listing the same employees, for the same pay periods, with the same hours multiple times—artificially inflating the alleged "restitution owed" and falsely justifying its draconian $11 million penalty assessment.  This is not an administrative misstep; it is willful and intentional government misconduct that demands immediate judicial intervention.

229.    Upon careful review of Denver Labor's so-called "wage theft" spreadsheets—documents it used to justify its arbitrary and punitive penalty determinations—there is undeniable evidence of fraudulent misrepresentations. These spreadsheets omit actual wages paid to employees, despite the fact that historical payroll records reflecting these payments were produced and provided to Denver Labor during its prior inquiries.  This was not a clerical oversight—it was a deliberate and calculated deception designed to paint an entirely false picture of the businesses.

230.    While Plaintiff Clubs do not intend to become bogged down in the technical errors of Denver Labor's fabricated data, the fact that it has issued public press releases and imposed crippling penalties under color of law based on knowingly falsified calculations is powerful evidence of the necessity of an immediate injunction against Denver Labor's continued and incessant abuse of governmental power.

231.    Denver Labor's pattern of harassment and deception, combined with its unlawful demands for confidential business records and unauthorized disclosures of private entertainer information, necessitates urgent judicial relief.

232.    One entertainer at the center of this dispute has falsely claimed to be owed minimum wage, despite the fact that she regularly earns over $1,000 in cash tips directly from clients in a single eight-hour shift.  Her deceptive public statements have only served to escalate this issue, jeopardizing the livelihoods of other entertainers and creating the perfect pretext for Denver Labor to interfere in their professional autonomy.  These malicious actions, based on a foundation of lies, are putting countless entertainers at risk of unwanted government intervention in their chosen profession.

233.    Denver Labor has falsely accused managers at Diamond Cabaret and Rick's Cabaret of "stealing" tips from entertainers and employees.  This claim is unequivocally untrue. Managers and supervisors are legally prohibited from taking any portion of their employees' tips, and they cannot receive tips from a tip pool or directly from customers unless they are performing a separate tipped job, where they are solely responsible for the service provided and not acting in a managerial capacity at that time. In reality, when a manager at Diamond Cabaret or Rick's works as a VIP Host, they are not acting as a "manager" during that period.  They are directly interacting with clients, handling transactions, and providing an option for clients to tip the VIP Host. Rather than "stealing" tips, these managers are doing the opposite.  They voluntarily share a portion of the tips they receive as VIP Hosts with the rest of the staff, which is entirely

lawful and consistent with proper tipping practices.  Denver Labor's false and misleading claims have created unnecessary confusion and harmed the reputation and operations of these businesses.

234.    The Auditor, the Auditor's Office, Denver Labor, and Director Fritz-Mauer each together and separately, published or caused to be published the following statements in the same or substantially similar words:

a.    "Denver Labor finds millions in wage theft at strip clubs."

b.    "Diamond Cabaret and Rick's Cabaret strip clubs have engaged in widespread wage theft harming its entertainers, bartenders, servers, and other workers."

c.    "This is an extraordinary case and unlike any other my office has conducted, due to the exorbitant amount of wages stolen, the strip clubs' overbearing employee rules, and their refusals to comply with our lawful investigations."

d.    "Diamond Cabaret and Rick's Cabaret misclassified entertainers (also called strippers or dancers) as exempt from wage and hour laws."

e.    "This misclassification led to wage theft, including rampant minimum wage violations, as the strip clubs were not paying them for their work."

f.    "Other tipped workers such as bartenders, servers, and barbacks had wages stolen."

g.  "Managers routinely took tips for work performed by tipped workers and entertainers."

h.  "During our investigations, Diamond Cabaret destroyed these forms, even though workers provided proof the documents exist."

i.  "Together, these clubs must pay $11,358,000 in restitution to more than 230 affected workers, which includes unpaid wages and stolen tips."

j.  "That amount was reached due to the $2.6 million in actual wages stolen . . . ."

235.    These statements have caused, and continue to cause the Plaintiffs actual damage.

236.    The substance or gist of the statements was false at the time they were published and continue to be false.

237.    At the time of publication, the Auditor, the Auditor's Office, Denver Labor, and Director Fritz-Mauer knew that the statements were false or the Auditor, the Auditor's Office, Denver Labor, and Director Fritz-Mauer each together and separately, made the statements with reckless disregard as to whether they were false.

238.    Accordingly, Denver Labor must be immediately enjoined from any further enforcement actions based on these fraudulent assessments, and a gag order must be imposed to prevent further dissemination of these falsehoods. If left unchecked, Denver Labor's reckless abuse of power and disregard for the limits of statutory authority will

not only cripple the businesses it targets but will also set a catastrophic precedent that jeopardizes every business, worker, and entrepreneur in Denver.

***The Consequence of Allowing Denver Labor's Unchecked Overreach is a Dismantling of the Denver Economy***

239.    If Denver Labor's actions are allowed to continue unchecked, every business, individual, and worker in Denver will be exposed to the threat of having their private, personal, and confidential information seized without consent.  The stakes are even higher for licensee entertainers who are protected by strict confidentiality clauses in their contracts with Plaintiff Clubs.  These confidentiality provisions were explicitly designed to protect the private information of entertainers, many of whom work other full-time day jobs, and are mothers, sisters, lawyers, or even government employees.

240.    Denver Labor's attempt to strip away these protections and force these individuals to disclose sensitive personal data—including work locations, hours, tips, and more—represents a gross violation of their rights and directly impacts their safety.

241.    Denver Labor's flagrant disregard for confidentiality is exemplified by Executive Director Fritz-Mauer's reckless disclosure of entertainer's real names during the January 22, 2025, publicly streamed First Penalty Determination appeal hearing.

242.    This public release of confidential information represents a profound betrayal of trust and a direct violation of the legal protections in place to safeguard the identities of these entertainers.  It exposes these individuals to public scrutiny and potential threats to their safety, demonstrating the complete disregard Denver Labor has for the autonomy and anonymity these entertainers require and deserve.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Fourteenth Amendment Due Process Property Interest**
**42 U.S.C. § 1983**
*(Against All Defendants)*

243.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

244.    At all times relevant hereto, Defendants were acting under color of law.

245.    Plaintiffs and Defendants are "persons" under 42 U.S.C. § 1983.

246.    The Fourteenth Amendment to the United States Constitution provides that no person acting under color of law may deprive any citizen of the United States or other person within the jurisdiction of the United States, of life, liberty, or property without due process of law.  Section 25 of Article II of the Colorado Constitution provides similar guarantees and protections.

247.    Plaintiffs were deprived of their property without due process of law.

248.    Defendants failed to provide constitutionally sufficient due process to Plaintiffs when Denver Labor and Director Fritz-Mauer initiated unauthorized investigations into Plaintiffs.

249.    Defendants failed to provide constitutionally sufficient due process to Plaintiffs when Denver Labor and Director Fritz-Mauer initially concealed the nature of their targeted and unauthorized investigations into Plaintiffs.

250.    Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor to issue document and information requests outside the bounds of the Auditor's statutory authority.

53

251. Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor to issue subpoenas outside the bounds of the Auditor's statutory authority.

252. Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor to apply adverse and harmful inferences against Plaintiffs for lawfully objecting to unlawful investigations and documents and information requests.

253. Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor to make unauthorized conclusions of law and facts, including unsupported legal determinations about entertainers' misclassification and tip pooling, to issue penalty determinations and impose excessive penalties and fines.

254. Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor to issue penalty determinations and impose penalties and fines without a reasonable basis in law.

255. Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor to issue penalty determinations and impose adverse and harmful inferences, and penalties and fines based on false statements.

256. Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor to impose adverse and harmful inferences, and penalties and fines against Plaintiffs before providing any right to a hearing.

257.   Defendants failed to provide constitutionally sufficient due process to Plaintiffs by failing to adhere to any published or disclosed procedures and safeguards for hearing officer qualifications and selection.

258.   Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor and Director Fritz-Mauer to assign his former boss, Hearing Officer Kelman, as the hearing officer to decide all disputes between Denver Labor and Plaintiffs.

259.   Defendants failed to provide constitutionally sufficient due process to Plaintiffs by failing to provide Plaintiffs a meaningful opportunity to present evidence in front of a neutral decisionmaker on its motions to quash subpoenas and modified subpoenas.

260.   Defendants failed to provide constitutionally sufficient due process to Plaintiffs by failing to provide Plaintiffs a meaningful opportunity to present evidence in front of a neutral decisionmaker in any of its appeals of unlawful penalty determinations, monetary penalties and fines.

261.   Defendants failed to provide constitutionally sufficient due process to Plaintiffs when Hearing Officer Kelman failed to serve as a neutral decisionmaker and apply the applicable laws as written.

262.   Defendants failed to provide constitutionally sufficient due process to Plaintiffs when Hearing Officer Kelman failed afford Plaintiffs with fair and impartial hearings and rulings.

263.    Acting under color of law, Defendants intentionally violated Plaintiffs' constitutional rights under the Due Process clause of the Fourteenth Amendment to the United States Constitution, by purposefully depriving Plaintiffs of their property interests when they imposed adverse and harmful inferences, issued penalty determinations, exorbitant fines, and excessive penalties without legal basis or authority, and did not allow Plaintiffs a meaningful opportunity to be heard in front of any neutral decisionmaker.

264.    Defendants failed to provide constitutionally sufficient due process to Plaintiffs by allowing Denver Labor to enforce arbitrary rules and procedures created in violation of required rulemaking procedures.

265.    Defendants failed to provide constitutionally sufficient due process to Plaintiffs by failing to promulgate its internal Rules of Procedure for Appeals and Hearings without participating in proper rule making procedures pursuant to DRMC § 2-91 through 2-100.

266.    Defendants failed to provide constitutionally sufficient due process to Plaintiffs by failing to promulgate its internal Civil Wage Theft Rules without participating in proper rule making procedures DRMC § 2-91 through 2-100.

267.    Defendants engaged in the above conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

268.    Defendants failed to intervene to prevent other Defendants from violating Plaintiffs' due process rights under the Fourteenth Amendment.

269.    Defendants participated or authorized the actions that violated Plaintiffs' rights.

270.    As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Plaintiffs suffered injuries, damages, and other losses, including but not limited to fines, penalties, and damage to Plaintiffs' reputations.  These injuries, damages, and other losses are ongoing.

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Train and Supervise
### 42 U.S.C. § 1983
*(Against Defendants the City, the Auditor, and the Auditor's Office)*

271.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

272.    At all times relevant to this Complaint, Defendants were acting under the color of law.

273.    Defendants the City, the Auditor, and the Auditor's Office have disregarded statutory limitations and engaged in unauthorized practices that have allowed Defendants Denver Labor and Director Fritz-Mauer to issue document requests, adverse and harmful inferences, penalty determinations, and fines and penalties in violation of Plaintiffs' constitutional due process rights.

274.    Defendants the City, the Auditor, and the Auditor's Office have consciously failed to train and supervise Denver Labor and Director Fritz-Mauer so that constitutional violations do not occur.

275.    Defendants the City, the Auditor, and the Auditor's Office have actual and constructive notice that their failure to adequately train and supervise Denver Labor and Director Fritz-Mauer are substantially certain to result in a constitutional violation and have consciously and deliberately chosen to disregard that risk of harm.

276.    Defendants deprived, and are continuing to deprive, Plaintiffs of the rights secured to them by the Fourteenth Amendment to the United States Constitution.

277.    Defendants' policies, practices, and customs are the moving force behind the constitutional deprivations described herein.

### THIRD CLAIM FOR RELIEF
### Declaratory Judgment
### 28 U.S.C. § 2201
*(Against All Defendants)*

278.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

279.    An actual and justiciable controversy exists between Plaintiffs and Defendants regarding the following:

a.    Denver Labor's authority to issue the penalty determinations;

b.    Whether Denver Labor exceeded the Auditor's statutory authority by imposing penalties without legal justification;

c.    Whether the administrative hearing processes, as conducted by Hearing Officer Kelman, violated Plaintiffs' due process rights;

d.    Whether Denver Labor's demands for confidential entertainer records exceeded the Auditor's investigatory authority under the DRMC;

e.    Whether the subpoenas, investigations, document and information requests, and penalties imposed on Plaintiffs were lawful under the DRMC and Denver's City Charter; and

f.    Whether Denver Labor's attempt to reclassify entertainers as employees was beyond the scope of the City and the Auditor's statutory authority.

280.    Based on the foregoing, Plaintiffs respectfully ask this Court to:

a.    Declare that all provisions of DRMC, Chapter 58, Article I, and Defendants' related rules are preempted and invalid to the extent they purport to enforce any state or federal law that does not specifically authorize enforcement by Defendants;

b.    Declare that all provisions of DRMC, Chapter 58, Article I, and Defendants' related rules are preempted and invalid to the extent they conflict with the provisions of state law, including the administrative procedures incorporated by Colorado wage laws and federal labor statutes;

c.    Declare that all enforcement provisions of DRMC, Chapter 58, Article I, and Defendants' related rules are preempted and invalid because they assign duties and powers to the Denver Auditor's

Office and Denver Labor that are inconsistent with the provisions of Denver's Charter;

d.    Declare that Defendants have no authority or jurisdiction to initiate investigations, impose penalties, or demand confidential business records beyond the statutory limits set forth in DRMC Chapter 58 and Denver's City Charter;

e.    Declare that Defendants have no authority or jurisdiction to reclassify independent contractors as employees in a manner inconsistent with state and federal labor laws;

f.    Declare that Denver Labor's fines and penalties imposed on Plaintiffs are invalid and unenforceable as they exceed the scope of statutory authority and violate Plaintiffs' due process rights;

g.    Declare that Defendants' enforcement actions, including the imposition of excessive fines and penalties, are unconstitutional takings in violation of the Fourteenth Amendment of the United States Constitution;

h.    Declare that Denver Labor's unauthorized demands for confidential entertainer and business records were unlawful and outside the scope of their investigatory authority under DRMC.; and

i.    Make any other declarations consistent with the constitutional and jurisdictional limitations of Defendants' authority to regulate wage and hour laws, as the Court may deem just and appropriate.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

a.  All appropriate relief at law and equity;

b.  Declaratory relief;

c.  Injunctive relief;

d.  Actual economic damages as established at trial;

e.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

f.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.  Issuance of an Order mandating appropriate equitable relief;

h.  Issuance of an Order enjoining Defendants and their officers, agents, affiliates, subsidiaries, employees, and all other persons or entities in active concert or privity or participation with them, from taking further retaliatory action against Plaintiffs;

i.  Issuance of an Order enjoining Defendants and their officers, agents, affiliates, subsidiaries, employees, and all other persons or entities in active concert or privity or participation with them, from further harassing Plaintiffs by, including but not limited to, issuing baseless requests for information, issuing illegal and unauthorized

subpoenas, and imposing arbitrary response deadlines to written correspondence.

j.     Pre-judgment and post-judgment interest at the highest lawful rate;

k.     Attorney's fees and costs; and

l.     Such further relief as justice requires.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 7th day of March, 2025.

*/s/ Leah P. VanLandschoot*
Leah P. VanLandschoot
Ruth A. McLeod
THE LITIGATION BOUTIQUE, LLC
78 West 11th Avenue
Denver, Colorado 80204
T: 303.355.1942
F: 303.355.2199
Email: lvanlandschoot@thelitbot.com
Email: rmcleod@thelitbot.com
***Attorneys for Plaintiffs***